# IN THE COURT OF APPEALS OF IOWA

No. 19-1429
Filed June 3, 2020

**STATE OF IOWA,**
    Plaintiff-Appellant,

**vs.**

**BRYAN JEFFREY STONE,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Plymouth County, Steven J. Andreasen, Judge.

The State challenges the grant of the defendant's motion to suppress evidence discovered in his vehicle. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellant.

Timothy J. Kramer of Kramer Law, P.C., Sioux Center, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

The State appeals the district court's grant of Bryan Stone's motion to suppress evidence found in his vehicle. That evidence prompted the State to charge Stone with burglary and possession of burglar tools. The district court excluded that evidence after finding a deputy unreasonably extended the duration of his encounter with Stone. In several layers of argument, the State seeks to restore that evidence. We find the deputy did not seize Stone until he observed burglar tools in the suspect's vehicle. Following that observation, the deputy developed probable cause to search the vehicle under the automobile exception to the warrant requirement. For these reasons, we reverse the suppression ruling and remand for further proceedings.

## I.      Facts and Prior Proceedings

Stone was leaving the rear parking lot of Hinton's Silver Dollar Saloon around two in the morning when Deputy Jake Wingert pulled up beside him. Stone already had his window down. In a window-to-window conversation, the deputy asked Stone "what he was doing on the property there." Stone said he left his cell phone in the smoking area behind the tavern and went to retrieve it.

Hearing this excuse, the deputy grew suspicious believing "there was most likely some level of criminal activity afoot." The deputy knew the tavern and a nearby farm cooperative had been burglarized in the past. But he did not testify how recently those incidents occurred. And when the deputy encountered Stone's vehicle, he was unaware a break-in had occurred earlier that night at Hillview Park, a campground about four miles outside Hinton.

During their conversation, the deputy noticed Stone "stuttering" as he spoke. Wingert later testified, "I wasn't initially sure if it was nerves or if he might possibly be intoxicated." In response to the deputy's questions, Stone said he was drinking Red Bull, not alcohol that night. Wingert doubted Stone's statement that he had been at the Silver Dollar until 1:30 a.m. because he did not believe the tavern had been open that late. As their exchange continued, the deputy also observed Stone "sweating profusely" from his forehead. Although it was a warm evening in late May, the deputy believed the amount of perspiration revealed Stone's consciousness of guilt.

The deputy called dispatch to check Stone's registration for the 1999 Chevy Blazer. Stone had a valid license and no outstanding warrants. Yet the deputy persisted. After parking his patrol car, Wingert approached the driver's window on foot. The deputy engaged Stone in "further conversation, investigating what the subject [was] doing on the property." As the deputy stood outside the Blazer, he spied "a screwdriver with a bent and sharpened tip on the floorboard of the front passenger area." In the rear floor area, Wingert saw a tire iron with a pry bar on one end. These items led the deputy to believe he might "indeed, be dealing with a burglar."

As his suspicion grew, Wingert waited for a fellow deputy to arrive and "check the rear of the Silver Dollar and see if any entry had been gained or any break-in had taken place." Wingert acknowledged that after he saw the tools, he would not have allowed Stone to leave.

Before dispatch notified Deputy Wingert about the break-in at Hillview Park, he handcuffed Stone and placed him in a patrol car. Only then did Wingert hear

radio traffic that a suspect had broken into a campground building. Witness descriptions of the suspect's vehicle and license plate matched Stone's Blazer. Plus, the witnesses "even identified him by the [Dallas] Cowboy's hat he had on."

When first questioned about the break-in, Stone denied being at Hillview Park. But when confronted with the witness accounts, he said he was there to look for a camping spot. Deputy Wingert arranged for the witnesses from the campground to observe Stone in the patrol car. According to Wingert, they positively identified Stone as "the individual that was walking away from the building that had been broken into."

Even with Wingert's coaxing, Stone refused consent to search the Blazer. Wingert told Stone if he didn't consent, deputies would apply for a search warrant. But they searched the Blazer without a warrant, finding additional items associated with the burglary. Deputy Wingert testified he had probable cause to search the Blazer and, alternatively, the search was incident to Stone's arrest. Wingert also testified to his department's impound and inventory procedures.

The State charged Stone with burglary in the second degree, a class "C" felony, and possession of burglar tools, an aggravated misdemeanor. Stone moved to suppress, challenging (1) the initial seizure, (2) the continued detention, and (3) the warrantless search of the vehicle. The motion cited both the Fourth Amendment of the U.S. Constitution and Article I, section 8 of the Iowa Constitution. Stone also alleged the show-up identification procedure was unreliable and violated his right to due process. In a supplemental motion, Stone

challenged Deputy Wingert's interrogation and alleged any incriminating statements were not voluntary.[1]

After a suppression hearing, where Wingert was the only witness,[2] the district court granted the motion in part and denied the motion in part. The court found the dividing line to be Deputy Wingert's impermissible extension of the detention. The court suppressed:

> [a]ny and all evidence obtained after the initial window-to-window encounter between Deputy Wingert and Defendant, including the observations of Deputy Wingert of the screwdriver and tire iron inside the vehicle, statements made by Defendant, additional items subsequently found in Defendant's vehicle, and the identification by witnesses of Defendant sitting in the patrol vehicle at Hillview campground as the person they observed earlier . . . .

The State applied for discretionary review of the suppression ruling. Our supreme court granted the application and transferred the appeal to us.

## II.    Scope and Standard of Review

Because Stone's state and federal constitutional rights are at issue, we review the State's challenge to the suppression ruling de novo. *See State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017). In doing so, we look at the full record and independently evaluate the totality of the circumstances. *Id*. Because the district court has a chance to assess witness credibility first hand, we defer to its factual findings. *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015). But they are not binding on us. *Id*.

---

[1] The district court did not address this issue in the ruling appealed by the State.

[2] The defense offered a dash-cam video into evidence. But the recording did not capture Deputy Wingert's initial encounter with Stone. It begins once Wingert places Stone in the patrol car.

Because search-and-seizure scenarios are so fact specific, we evaluate each case by its unique circumstances. *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019).

### III.    Analysis

### A.    Did the deputy seize Stone during their initial conversation?

To start, we analyze Deputy Wingert's first interaction with Stone—what the district court called their "window-to-window encounter."  If that encounter was not a "seizure," then Stone cannot claim that it violated his rights under the Fourth Amendment or Article I, Section 8.[3]  *See State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008).  Obviously, "not all personal intercourse between the police and citizens involve 'seizures' of persons. . . .  'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'"  *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 20 n.16 (1968)).  Stone bears the burden to prove a seizure occurred. *See Fogg*, 936 N.W.2d at 668.

We look to the totality of circumstances.  *See id.*  Both Stone and Wingert were inside their vehicles.  Stone was stopped in a parking lot.  Deputy Wingert pulled beside Stone's Blazer.  Wingert did not block Stone's path.  The district court found, "Although [Stone] theoretically could have ignored Deputy Wingert and simply exited the parking lot, the actions of Deputy Wingert indicated a request and intent for [Stone] to stay put, so that Deputy Wingert could talk to him."

---

[3] Because Stone does not argue for a separate analysis under the state constitution, we apply the general federal framework.  *See Fogg*, 936 N.W.2d at 667.

Despite that finding, the district court did not decide whether the deputy's actions amounted to a seizure. Instead, the court ruled Deputy Wingert had reasonable suspicion to make this "minimal intrusion" upon Stone. The court cited the early morning hour and Stone's presence in the parking lot of a closed business. The court also noted the deputy's general awareness of burglaries in the area, though it acknowledged the deputy did not testify to any recent reports. In this vein, the court recognized the facts were much like *State v. Haviland*, 532 N.W.2d 767, 770 (Iowa 1995), in which the court held it was unreasonable for police to seize someone upon "a generalized suspicion that any vehicle in the vicinity of the closed business entrance might be engaged in criminal activity."

On appeal, the State urges the window-to-window encounter was not a seizure. The State does not defend the district court's reliance on reasonable suspicion for the initial intrusion upon Stone. For his part, Stone asserts the legality of the initial encounter is not before us as part of the State's interlocutory appeal. But he does not concede the encounter was consensual.

Contrary to Stone's assertion, the legality of the initial encounter appears as a threshold question in the State's appeal. After considering the totality of circumstances, we agree with the State that the encounter was not a seizure. Although in uniform and driving a patrol car, Deputy Wingert did not make a show of authority, use intimidation, or physical force. *See State v. Reinders*, 690 N.W.2d 78, 83 (Iowa 2004); *State v. Brown*, No. 14–0667, 2015 WL 5577971, at *2 (Iowa Ct. App. Sept. 23, 2015) (giving little weight normal indicia of police presence, including uniform and marked car). Wingert did not turn on his lights or siren. He did not block Stone's path of exit. He simply engaged Stone in conversation. To

that end, Wingert testified he was "nonchalant" in first asking, "Hey, what are you doing?" This record does not support Stone's claim Wingert seized him while they were both in their vehicles.

## B. Did the deputy impermissibly prolong a consensual encounter?

So when the deputy parked his patrol car and approached the Blazer on foot, did the consensual encounter turn into a seizure? Deputy Wingert testified that after less than one minute of the window-to-window contact, he called the Blazer's plate into dispatch. He then parked, exited his patrol vehicle, and walked over to ask Stone more questions.

During that conversation, Deputy Wingert "continued to believe [Stone] was nervous" and "right away" noticed a screwdriver "on the floorboard of the front passenger area." Wingert testified he could see the screwdriver had "a bent and sharpened tip." He speculated a person would not have "a screwdriver with a bent tip unless you are using it to break into buildings or padlocks or something of that nature." Wingert also saw a tire iron that could be used as pry bar on the rear floor. Deputy Wingert testified that after he saw those items, Stone was not free to leave.

Ticking back before the deputy saw the tools, the district court ruled Wingert "did not have reasonable suspicion of criminal activity to extend or prolong the stop in this manner." The court decided Wingert's second intrusion was greater than the initial window-to-window encounter. In the court's view, Stone "was definitely seized at this point in time."

Largely, the State disagrees. The State argues, "Deputy Wingert did not need reasonable suspicion until he initiated a seizure, which was the point where he asked Stone to step out of the car." In the alternative, the State contends, "At

worst, the encounter would become a seizure at some point during the follow-up conversation, after Deputy Wingert parked and walked back to converse with Stone through the window." On the other side, Stone believes Wingert seized him when he parked and walked back to the driver's window.

Neither the district court nor Stone offers a clear explanation why the police-citizen encounter changed from consensual to coercive when Wingert approached on foot. Neither points to precedent where the police flipped that switch. On the contrary, Deputy Wingert asked Stone the same type of questions after parking as he did during their window-to-window exchange. Police questioning alone does not constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Deputy Wingert remained the only officer at the scene; he did not draw his weapon; and his parked cruiser did not block Stone from leaving. *See United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995) (finding no seizure on similar facts). No further show of authority or physical restraint occurred. In fact, on foot, the deputy assumed a more vulnerable position than in his patrol car. A reasonable person in Stone's shoes would not have believed he had been seized when Wingert returned. See *Bostick*, 501 U.S. at 436 (articulating test as "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter"); *Fogg*, 936 N.W.2d at 669 (explaining to prove seizure, defendant must show coercive or authoritative behavior).

Like the State, we draw the line of demarcation between voluntary encounter and seizure when the deputy directed Stone to step out of the Blazer. Until then, Stone's ability to drive away was not substantially impaired. *See Fogg*, 936 N.W.2d at 669 (finding no seizure when "the officer was simply engaging in

activity that any *private* person would have a right to engage in"); *see also State v. White*, 887 N.W.2d 172, 177 (Iowa 2016) (finding seizure when officer's directive to defendant was mandatory).

### C.   Did seeing the screwdriver and pry bar give the deputy reasonable suspicion or probable cause to seize Stone?

After concluding Wingert seized Stone without reasonable suspicion to prolong the stop, the district court also entertained an alternative analysis.

> IF Deputy Wingert's contact with [Stone] at the driver's side window after Deputy Wingert exited his patrol vehicle were considered to be reasonable, the observation of the screwdriver with a bent tip and tire iron inside the vehicle may have created additional reason for suspicion justifying a prolonged seizure.

The defense played down the significance of those tools.  On cross examination, Deputy Wingert acknowledged Stone was driving an older model Blazer with "odds and ends of junk" scattered inside.  The deputy also conceded it was not illegal to possess a screwdriver or a tire iron.

But when considered in the totality of the circumstances, we find the tools were telling.  The deputy patrolled that area of Hinton knowing the tavern and co-op had been burglarized in the past—the co-op "more recently."  His conversation with Stone occurred in the early morning hours outside a closed business.  *See State v. Richardson*, 501 N.W.2d 495, 497 (Iowa 1993) (finding reasonable cause to stop car after midnight in "nonresidential area where there were no legitimate attractions" and deputy knew "this area had frequently been burglarized").  Moreover, Stone's explanation of his presence contradicted what Deputy Wingert knew about the Silver Dollar's business hours.

And Stone appeared extremely nervous. We recognize nervousness during encounters with police is of limited significance. *See Pardee*, 872 N.W.2d at 394. But extreme nervousness remains one ingredient in the overall recipe for reasonable suspicion. *See State v. Aderholdt*, 545 N.W.2d 559, 564 (Iowa 1996) (explaining detainee's responses may raise suspicions allowing officers to broaden their inquiries). On top of that, the deputy saw tools suited for committing burglaries within Stone's reach.

Given this array, we find the deputy had reasonable suspicion to detain Stone until another deputy could arrive to check the Silver Dollar for signs of forced entry. Stone claims nothing about his answers to Deputy Wingert's queries created reasonable suspicion of criminal activity. But "reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful." *See Richardson*, 501 N.W.2d at 497. The primary purpose of an investigatory detention "is to resolve the ambiguity as to whether criminal activity is afoot." *Id.* After seeing what appeared to be burglar tools in Stone's vehicle, Deputy Wingert had reasonable suspicion to hold Stone briefly until he could resolve the situation's ambiguity.

Within minutes after seizing Stone, Wingert received word of the campground break-in. Then his investigation shifted to solving that crime. Because witnesses could place Stone and his Blazer at the scene, Deputy Wingert had probable cause to arrest Stone for that offense.

**D.** **Was the search of the Blazer justified under the automobile exception to the warrant requirement?**

The State next challenges the district court's determination that the deputy's warrantless search of the Blazer was unreasonable. At the suppression hearing, the State urged three exceptions to the warrant requirement: search incident to arrest, automobile exception, and impound-inventory. The court rejected all three. On appeal, the State focuses on the automobile exception.

Both federal and state courts recognize a "'well-delineated' exception to the warrant requirement for searches of automobiles and their contents." *State v. Allensworth*, 748 N.W.2d 789, 792 (Iowa 2008) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). The automobile exception applies when police seize a motorist and have probable cause to search their vehicle. *State v. Storm*, 898 N.W.2d 140, 145 (Iowa 2017). "The inherent mobility of motor vehicles satisfies the exigent-circumstances requirement." *Id.* In *Storm*, our supreme court declined "to replace the easy-to-apply automobile exception with a case-by-case exigency determination" under the state constitution. *Id.*

In the suppression ruling, the district court rejected the automobile exception because "[e]xigent circumstances did not exist." The State contends that ruling is inconsistent with *Storm*. The State quotes an excerpt from the majority's decision in *Storm* relying on a Nebraska case:

> [W]e hold that the requirement of ready mobility for the automobile exception is met whenever a vehicle that is not located on private property is capable or apparently capable of being driven on the roads or highways. This inquiry does not focus on the likelihood of the vehicle's being moved under the particular circumstances and is generally satisfied by the inherent mobility of all operational vehicles. It does not depend on whether the defendant has access to the vehicle at the time of the search or is in custody, nor on whether the

vehicle has been impounded. The purpose of the ready mobility requirement is to distinguish vehicles on public property from fixed, permanent structures, in which there is a greater expectation of privacy.

*Id.* at 149–50 (quoting *State v. Rocha*, 890 N.W.2d 178, 207 (Neb. 2017)).

Stone does not defend the district court's holding that the deputy needed additional exigent circumstances. Stone instead seizes on *Rocha's* reference to "private property" and contends the search of his Blazer was "not the kind of roadside stop contemplated by the court in *Storm.*" Second, he argues "any probable cause Deputy Wingert had to arrest Stone for the Hillview Campground burglary did not extend to his vehicle."

We reject both of Stone's contentions. On the private-property issue, it is true that the automobile exception does not apply to a vehicle searched in a place "regularly used for residential purposes." *See California v. Carney*, 471 U.S. 386, 392 (1985). In other words, police cannot rely on the automobile exception if the vehicle is parked in a private residential parking space or driveway. *See, e.g.*, *Commonwealth v. Loughnane*, 173 A.3d 733, 745 (Pa. 2017); *State v. LeJeune*, 576 S.E.2d 888, 893 (Ga. 2003); *State v. Hernandez*, 410 So. 2d 1381, 1384 n.1 (La. 1982).

But the residential exception to the automobile exception does not preclude searching a vehicle in a "public place" like the parking lot of a business. *See, e.g.*, *State v. Sarden*, 699 S.E.2d 880, 883 (Ga. App. 2010); *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010). Our supreme court has upheld warrantless searches under the automobile exception that did not occur at the roadside. *See Allensworth*, 748 N.W.2d at 797 (upholding search at police station); *State v. Cain*,

400 N.W.2d 582, 585 (Iowa 1987) (upholding search of defendant's "lawfully parked but fully mobile vehicle"); *State v. Lam*, 391 N.W.2d 245, 248 (Iowa 1986) (upholding seizure of car "backed into a parking space at the lot of the apartment complex" where burglary occurred). The Silver Dollar was not Stone's residence. So the automobile exception applied. The district court was mistaken in requiring exigent circumstances beyond the vehicle's inherent mobility. *See Storm*, 898 N.W.2d at 156.

On probable cause, we reject Stone's assertion Deputy Wingert possessed no details of the campground crime to justify searching the Blazer. In fact, the deputy confronted Stone with the fact that "the witnesses gave the plate of his vehicle along with the vehicle description." Plus, Wingert spotted what looked to him like burglar tools in the Blazer. With that amount of information, the deputies had probable cause to search the entire Blazer. *See State v. King*, 191 N.W.2d 650, 657 (Iowa 1971) (holding officers had probable cause to search trunk "after discovering the pistol, gloves, burglary tools and coin box in the passenger compartment").

To recap, in our de novo review, we determine Deputy Wingert did not seize Stone until he asked him to step out of the Blazer. Reasonable suspicion supported that seizure. Further investigation revealed Stone was a suspect in a campground burglary earlier that night. The deputies properly searched Stone's vehicle under the automobile exception. Having reached these determinations, we reverse the ruling granting Stone's motion to suppress. We remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**